IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

TEXAS MIDSTREAM GAS SERVICES, §
L.L.C., §
                          §
            Plaintiff, §
                          § Civil Action No. 3:08-CV-1724-D
VS. §
                          §
CITY OF GRAND PRAIRIE, et al., §
                          §
           Defendants. §

<u>MEMORANDUM OPINION</u>

A natural gas gathering company's preliminary injunction application presents questions concerning a local government's power to regulate through zoning various safety and aesthetic aspects of the design and construction of an intrastate gas compressor station. The court must decide whether defendant City of Grand Prairie's ("the City's") attempts to enforce its Unified Development Code against plaintiff Texas Midstream Gas Services, L.L.C. ("TMGS") are preempted by the Pipeline Safety Act ("PSA"), 42 U.S.C. §§ 60101-60137, and state law, interfere with TMGS' state-law power of eminent domain, and violate the dormant Commerce Clause of the United States Constitution. With one exception——a requirement that TMGS erect an eight-foot high security fence around the compressor station site——the court holds that the Code survives plaintiff's challenges.[1] TMGS' preliminary injunction application is therefore granted to the limited extent of enjoining

---

[1]As permitted by Fed. R. Civ. P. 52(a), the court sets out its findings of fact and conclusions of law in this memorandum opinion.

enforcement of the security fence requirement, and is otherwise
denied.

I

TMGS, a midstream gas gatherer, transports natural gas by
pipeline from underground sources into a compressor station, where
the gas is compressed and transported by another company to the
consumer.[2]  TMGS acquired land in Grand Prairie to build a
compressor station, and it informed the City of its intention.
During the following months, the City considered amending Article
4 of its Unified Development Code, governing land use, to add a
section relating to natural gas compressor stations.  During public
hearings, TMGS objected to the legality of proposed § 10.  After
the City enacted § 10 in July 2008, TMGS filed this lawsuit.

Under § 10, a Specific Use Permit ("SUP") is required to build
a compressor station in certain zoning districts, including the one
in which TMGS' land is located.  *See* Grand Prairie, Tex., Unified
Dev. Code art. 4, § 10 (2008).  Several conditions must be met
before the City will issue an SUP.  A person who undertakes
construction in violation of § 10 is subject to civil penalties of

---

[2]Although the court has heard oral argument on TMGS'
application, it is deciding this application without conducting an
evidentiary hearing or receiving oral testimony, as permitted under
Rule 43(c).  The court's factual findings are based on the evidence
presented in the parties' papers.  The court need not address the
City's objections to the declaration of Kent Wilkinson or TMGS'
response because it has not relied on any statements to which the
City objected.

up to $2,000 per day.  *Id*. art. 21, § 11.1(A).  Additionally, other permits must be obtained before a compressor station is constructed, including driveway permit, clearing and grubbing, and flood plain permits.  Although TMGS has petitioned for a writ of mandamus ordering the issuance of the other required permits, TMGS seeks by this lawsuit only to enjoin § 10.

## II

The City maintains that TMGS lacks standing to challenge § 10 because its injury is speculative.  It also asserts that the challenge is not ripe.  Because standing and ripeness are prerequisites to the exercise of federal jurisdiction, the court considers these contentions first.  *See Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 544 (5th Cir. 2008) (addressing, *inter alia*, ripeness); *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 721 (5th Cir. 2007) (addressing standing).

### A

The court first considers the question of standing.  The requirement that a plaintiff have standing to sue involves "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  To satisfy the requirements of Article III of the Constitution, TMSG must show, at an "irreducible constitutional minimum," that it has "suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the

injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  An injury in fact must be "concrete and . . . actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (citations omitted). Moreover, "the injury must affect the plaintiff in a personal and individual way."  Id. at 560 n.1.

According to the declaration of one of TMGS' managers, TMGS has already made plans to build the compressor station, has expended considerable sums of money in preparation, including for acquisition of land and necessary easements, and has designed a system of pipelines to connect to the compressor station.  There is no indication that its plans are tentative or merely hopeful.  *Cf. Lujan*, 504 U.S. at 564  (holding that plaintiffs who alleged merely "some day intentions" without any concrete plans lacked standing). Although TMGS must still obtain other permits and apply for an SUP under § 10 before constructing the compressor station, this does not render its challenge to § 10 speculative.

> In all the cases in which the Supreme Court denied standing because the injury was too speculative there was either little indication in the record that the plaintiffs had firm intentions to take action that would trigger the challenged governmental action, or little indication in the record that, even if plaintiffs did take such action, they would be subjected to the challenged governmental action.

*Verizon Wireless (VAW) LLC v. City of Rio Rancho*, 476 F.Supp.2d

- 4 -

1325, 1331 (D.N.M. 2007) (quoting *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1407 (9th Cir. 1991)).  TMGS has firm intentions to build the compressor station in Grand Prairie.  And it is undisputed that the City will require TMGS to obtain an SUP under § 10 to construct the station.  Therefore, the conflict between TMGS and the City over the validity of § 10 is real and immediate.  TMGS has established injury-in-fact.

The elements of causation and redressability are also clearly satisfied.  The injury asserted by TMGS——being forced to comply with an allegedly invalid law——is fairly traceable to the City, which intends to enforce § 10.  Moreover, a judgment in favor of TMGS that enjoins § 10 will redress the injury.

B

The court now turns to the ripeness issue.

1

"'The basic rationale [behind the ripeness doctrine] is to prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements.'"  *Roark & Hardee*, 522 F.3d at 544 (alteration in original) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).  It weeds out "those matters that are premature because the injury is speculative and may never occur."  *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000).  "The key

considerations are the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required." *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003) (internal quotation marks and citations omitted).

The City maintains that TMGS' claims are not ripe because the permitting process has not been completed. It argues that because TMGS has not applied for an SUP or any of the other required permits, it cannot be determined whether the City ultimately will deny an SUP or whether complying with § 10 will cause TMGS any injury. Thus the City contends that TMGS' claims are contingent and speculative.[3]

TMGS responds that it challenges the facial validity of § 10, not § 10 as applied; that because it objects to the mere presence of the SUP requirement, its failure to apply for an SUP or the other permits is not controlling; and that although it is ready to construct the compressor station, it is compelled to decide whether to comply with an allegedly invalid law or to proceed with

_____

[3]The City also asserts that TMGS' claims are not ripe because the City may amend or repeal § 10 before it affects TMGS. This argument lacks merit. Section 10 currently affects TMGS because it requires TMGS to decide whether to modify its plans in order to comply. And as TMGS suggests, such a possibility would defeat all otherwise ripe challenges to local, state, or federal law. *See Riva v. Commonwealth of Mass.*, 61 F.3d 1003, 1011 (1st Cir. 1995)(reasoning that "theoretical possibility" of repeal of statute does not by itself defeat ripeness).

construction as planned, incurring stiff civil penalties.

The court holds that TMGS' challenge to § 10 is ripe. First, its claims based on preemption, eminent domain, and the dormant Commerce Clause address the City's legal authority under § 10 to require an SUP. As such, they do not depend on whether or when an SUP ultimately is granted or denied. Preemption is a "predominantly legal" question. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983). Moreover, regarding all the claims, it is undisputed that TMGS must comply with § 10 and that its inability or refusal to do so will result in the denial of an SUP even if it obtains all the other required permits. And TMGS maintains that it has already expended a considerable sum in preparation to build the compressor station and intends to begin construction soon. Thus TMGS' claims do not rely on unforeseeable future events.

This is unlike the facts of *Texas v. United States*, 523 U.S. 296, 300 (1998), which the City cites, where the events on which the plaintiff's claim rested were not "currently foreseen or even likely." *Id.* ("Under these circumstances, where we have no idea whether or when [a future contingent event will occur], the issue is not fit for adjudication." (internal quotation marks omitted)). Therefore, the issues presented by TMGS' preliminary injunction application are fit for judicial decision.

*Monk*, on which the City also relies, is inapposite. In *Monk* the Fifth Circuit held that a suit by landowners to enjoin the Texas Commission on Environmental Quality ("TCEQ") from considering another applicant's landfill permit application was not ripe because the TCEQ had not yet decided whether to grant the permit. The landowners alleged a violation of procedural due process because of the lack of ascertainable standards to guide the TCEQ's decision. The court reasoned that the landowners would suffer no deprivation of property unless and until the TCEQ issued the permit. Because constitutional procedural protections applied only to a deprivation of life, liberty, or property, and not in the abstract, the landowners' claim remained "hypothetical." *Monk*, 340 F.3d at 282-83. The TCEQ would not run afoul of the Constitution until it rendered a permitting decision. By contrast, in the present case, TMGS argues that the City is violating the Constitution, and federal and state law, merely by requiring a permit under § 10. TMGS will still have claims even if it conforms its conduct to comply with § 10 and receives the required SUP.

TMGS would experience significant hardship were the court to defer consideration of the preliminary injunction application. It would be faced with an "immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation." *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57 (1993). TMGS would be compelled to

decide whether to modify its plans and build the compressor station in accordance with § 10, resulting in sunk costs should § 10 be held invalid, or to incur daily civil penalties of up to $2,000. Thus TMGS feels the effects of § 10 "in a concrete way." *Id.* (internal quotation marks omitted); *see also Abbott Labs.*, 387 U.S. at 152-53 (holding challenge to FDA regulations ripe where drug companies were compelled either to make costly changes to labeling and advertising or face severe criminal and civil penalties); *Verizon Wireless*, 476 F.Supp.2d at 1331-32 (holding preemption claims ripe despite telecommunication company's failure to apply for permit where it was required to decide whether to comply with allegedly invalid law or risk substantial penalties for noncompliance); *Roark & Hardee*, 522 F.3d at 545 ("[W]here a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, hardship has been demonstrated." (alteration in original) (internal quotation marks omitted)). Moreover, no countervailing benefit to the City or the public at large would be gained merely by postponing litigation of § 10's validity until after TMGS applies for an SUP and other required permits. *See Triple G Landfills, Inc. v. Bd. of Comm'rs. of Fountain County*, 977 F.2d 287, 290 (7th Cir. 1992) (considering whether countervailing benefit to the judicial process or public at large would be gained by postponing plaintiff's challenge to local

ordinance) (citing *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 582 (1985)).

III

Having determined that TMGS has standing and that its challenge to § 10 is ripe, the court next considers whether TMGS is entitled to a preliminary injunction.

A party seeking a preliminary injunction must establish four elements: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm to plaintiffs if the injunction is not granted, (3) that the threatened harm outweighs any damage that the injunction might cause the opposing party, (4) that the injunction will not disserve the public interest. *Jones v. Bush*, 122 F.Supp.2d 713, 718 (N.D. Tex.) (Fitzwater, J.) (citing *Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 777 F. Supp. 1349, 1353 (N.D. Tex.) (Fitzwater, J.), *aff'd*, 948 F.2d 1286 (5th Cir. 1991) (per curiam) (unpublished table decision)), *aff'd*, 244 F.3d 134 (5th Cir. 2000) (per curiam) (unpublished table decision). In cases of express preemption, "the finding with respect to likelihood of success carries with it a determination that the other three requirements have been satisfied." *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006) (citing *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 783 (5th Cir. 1990), *abrogated on other grounds by Heimann v. Nat'l Elevator Indus.*

*Pension Fund*, 187 F.3d 493 (5th Cir. 1999)).[4]  "A preliminary injunction 'is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion.'"  *Id.* (quoting *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989); *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).  The "'decision to grant a preliminary injunction is to be treated as the exception rather than the rule.'"  *Gryphon Master Fund, L.P. v. Path 1 Network Techs., Inc.*, 2007 WL 1723703, at *2 (N.D. Tex. June 14, 2007) (Fitzwater, J.) (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985)).

---

[4]The City maintains that TMGS must satisfy all four elements, noting that *VRC* involved a permanent, rather than a preliminary, injunction.  The court agrees with TMGS that it need only establish a likelihood of success on the merits.  Although *VRC* did involve a permanent injunction, it relied on the reasoning of *Trans World Airlines*, which affirmed the grant of a preliminary injunction. *See Trans World Airlines*, 897 F.2d at 783-84.  Moreover, the reasons why likelihood of success on an express preemption claim justify the grant of a permanent injunction apply with equal force to a preliminary injunction.  The substantial threat of irreparable injury results from complying with a preempted law, which violates the "federally created right to have only one regulator" in the preempted area.  *Id.* at 784.  There is no countervailing injury to the state because it is already obligated under the Supremacy Clause not to regulate in the preempted area.  Finally, because Congress has determined that exclusive federal regulation is desirable in the preempted area, the public interest weighs in favor of an injunction.

IV

The court first addresses whether TMGS has established a substantial likelihood of success on the merits of its preemption claim.

A

TMGS maintains that the PSA and state law preempt § 10.[5] The parties' dispute centers on whether § 10 regulates the safety of compressor stations or governs other aspects, such as aesthetics.

1

The PSA was enacted in 1994 as a re-codification, without substantive change, of two statutes: the Natural Gas Pipeline Safety Act of 1968 ("NGPSA") and the Hazardous Liquids Pipeline Safety Act of 1979 ("HLPSA"). *See* Pub. L. No. 103-272 (1994); *see generally* Randy J. Sutton, Annotation, *Validity, Construction, and Application of Pipeline Safety Act*, *49 U.S.C.A. §§ 60101 et. seq., and Other Acts Subsumed Therein*, 186 A.L.R. Fed. 361 (2003). Its purpose is to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline

---

[5]To the extent that § 10 is preempted by the PSA as a safety standard, it is also preempted under state law, which prohibits municipalities from regulating the safety of pipeline facilities. Tex. Utils. Code § 121.202(a) (Vernon 2007). The court need not consider Texas preemption separately because the outcome would be the same.

Additionally, the parties do not dispute that the PSA preempts § 10 if it is determined to be a safety regulation. The court need not therefore consider whether § 10 is preempted solely under Texas law because only an intrastate compressor station is at issue.

facilities." 49 U.S.C. § 60102(a)(1) (2000). The PSA directs the
Secretary of the Department of Transportation ("DOT") to "prescribe
minimum safety standards," which "may apply to the design,
installation, inspection, emergency plans and procedures, testing,
construction, extension, operation, replacement, and maintenance of
pipeline facilities." *Id*. § 60102(a)(2).

Under this authority, the Secretary of Transportation has
promulgated regulations pertaining to pipeline safety. *See* 49
C.F.R. §§ 192.1-193.2917, 195.0-195.589 (2008). The regulations
prescribe safety standards not only for pipelines but for related
structures, including compressor stations. *See id*. §§ 192.3,
192.163-173. These standards apply to the design and construction
of compressor stations. *Id*. § 192.163. First, each main building
of a compressor station "must be far enough away from adjacent
property, not under control of the operator, to minimize the
possibility of fire being communicated to the compressor building
from structures on adjacent property," and there must be "enough
open space around the main compressor building to allow the free
movement of fire-fighting equipment." *Id*. § 192.163(a). Second,
buildings containing a certain type of equipment or pipe must be
made of non-combustible materials. *Id*. § 192.163(b). Third, each
operating floor of a main compressor building must have at least
two exits that allow convenient escape to a place of safety. The
exit doors must open easily from the inside without a key and swing

outward. *Id*. § 192.163(c). Fourth, "each fence around a compressor station must have at least two gates" or other facilities that allow convenient escape to a place of safety and, in certain cases, they must open from the inside without a key. *Id*. § 192.163(d). Fifth, electrical equipment and wiring within the compressor station must comply with the National Electrical Code. *Id*. § 192.163(e).

The PSA contains an express preemption provision that prohibits state authorities from adopting or enforcing safety standards for interstate pipeline facilities or interstate pipeline transportation. 49 U.S.C. § 60104(c). It also prohibits state authorities from adopting or enforcing safety standards for intrastate pipeline facilities and intrastate pipeline transportation unless the state authority is either certified by DOT or has an agreement with DOT. *Id*. §§ 60104(c), 60106(a). Grand Prairie is not certified by DOT and does not have an agreement with DOT permitting it to regulate pipeline safety.

2

Section 10 requires TMGS to obtain an SUP before it builds a natural gas compressor station on its land. *See* Grand Prairie, Tex., Unified Dev. Code art. 4, § 10 (2008). Section 10 prescribes several conditions for obtaining an SUP. First, TMGS must secure a building permit for the "station complex" and an approved, platted lot. *Id*. § 10.1. Second, the compressor station buildings

and equipment are subject to a minimum setback.  *Id*. § 10.2.  The setback varies according to the nature of the adjoining zoning district, up to a maximum of 300 feet, applicable to all yards. Third, a "security fence" of at least eight feet in height must enclose the compressor station site.  *Id*. § 10.3.  A portion of the fence that fronts a public right-of-way must be made of wrought iron, with brick or stone columns every 50 feet.  Fourth, the equipment and "sound attenuation structures" must be enclosed within a building, with a "portion of its exterior walls constructed of masonry."  *Id*. § 10.4.  The building is subject to the following additional requirements:

> A.   A four (4) foot high masonry bulkhead wall shall be constructed on [at] least two (2) building facades most visible to the public.
>
> B.   At least two (2) building facades, specifically those most visible to the public, shall be constructed with a brick or stone accent that is at least twenty (20) feet in width, and extends vertically to the roof line of the building and terminates with a sloped or arched profile.
>
> C.   The roof shall be sloped with a pitch of no less than 5:12 and shall contain at least one raised structure in the form of a cupola, steeple tower, clear-story element or similar structures.  No flat roofs shall be permitted.
>
> D.   The non-masonry wall surfaces may be constructed of painted metal, stucco or cementious fiber board material.  Engineered wood paneling shall not be permitted for the finished exterior.

E.   The architectural design of the building shall be compatible with the visual context of the surrounding development.   Such buildings may be designed as a representation of, but not be limited to, the following building types:

1.   Barn structure or equestrian facility
2.   Estate residence
3.   School facility or similar institutional use
4.   Gazebo or picnic area enclosures
5.   Club house or recreational facility
6.   Retail or office building
7.   Any combination of the above as approved by the City

*Id*. Fifth, the driveway from the street to the station complex and driving and parking areas within the complex must be paved with concrete.  *Id*.  Sixth, the "operation of the equipment shall not create any noise that causes the exterior noise level to exceed the pre-development ambient noise levels as measured within three hundred (300) feet of the compressor station building(s)."  *Id*. § 10.5.  Seventh, the "compressor station site shall be landscaped in a manner that is compatible with the environment and existing surrounding area."  *Id*. § 10.6.

B

"It is axiomatic that, under the Supremacy Clause, state laws that interfere with, or are contrary to the laws of [C]ongress, made in pursuance of the [C]onstitution are invalid."  *Franks Inv. Co. v. Union Pac. R.R. Co.*, 534 F.3d 443, 445 (5th Cir. 2008)

(internal quotation marks omitted). Federal law may preempt state or local law in "three well-established ways." *Id.* First, Congress may expressly preempt state law by "clearly and explicitly" articulating its intent to preempt state law in a defined area. *Id.* Second, even where Congress does not address it, preemption will be implied where federal law "occup[ies] a field so pervasively as to naturally exclude" state law. *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 333 (5th Cir. 2007). Third, state law is preempted to the extent that it conflicts with federal law, precluding simultaneous compliance with both laws, or impeding achievement of the full purposes and objectives of Congress. *Id.* at 334. Despite these analytical distinctions, the "purpose of Congress is the ultimate touchstone" in every preemption case. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted); *see also Empacadora de Carnes*, 476 F.3d at 333 ("When addressing preemption claims, our sole task is to ascertain the intent of Congress." (internal quotation marks omitted)).

C

Because the PSA contains a preemption provision, the question presented is whether § 10 is expressly preempted. In resolving this question, the court begins with the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of

Congress." *Pac. Gas & Elec.*, 461 U.S. at 205 (internal quotation marks omitted). Because § 10 is an exercise of the traditionally local police power of zoning and land use regulation, it benefits from the presumption against preemption. *See Ga. Manufactured Housing Ass'n v. Spalding County*, 148 F.3d 1304, 1311 (11th Cir. 1998) (applying presumption to local zoning ordinance); *Fla. E. Coast Ry. Co. v. City of West Palm Beach*, 266 F.3d 1324, 1328-29 (11th Cir. 2001) (same) ("The Supreme Court has long recognized the authority of local governments to establish guidelines for the use of property through such zoning ordinances.").

The court must interpret the PSA and determine the domain of state and local laws that it preempts. *See Fla. E. Coast Ry.*, 266 F.3d at 1329 ("Where, as here, Congress has included a specific provision governing the pre-emptive effect of the legislation, we must 'identify the domain expressly preempted.'" (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992))). As evidenced by its name, the PSA addresses only the safety aspects of pipeline facilities. *Cf. Empacadora de Carnes*, 476 F.3d at 334 ("The [Federal Meat Inspection] Act's title refers specifically to meat *inspection*, rather than a more comprehensive scheme of meat regulation."). Further, the text of the PSA's preemption provision refers to "safety standards." 49 U.S.C. § 60104(c). Although the statute does not include a definition of the term "safety," *see id.* 49 U.S.C. § 60101, the express purpose of the statute provides some

insight into its meaning.  The PSA's goal is to protect against "risks to life and property" posed by pipeline transportation and pipeline facilities, including compressor stations.  *Id*. §§ 60102(a)(1), 60101(a)(3); *see also* 49 C.F.R. 192.3 (defining "pipeline" to include "compressor units").  Therefore, state and local government authorities not certified or otherwise authorized by DOT cannot impose regulations to reduce these risks.  The question that next arises is how close——or how attenuated——a link to safety will cause a state or local law to fall within the reach of the PSA's express preemption.

Cases decided under the PSA or its predecessor statutes hold that the statute preempts the entire domain of pipeline safety. *See*, *e.g.*, *Natural Gas Pipeline Co. of Am. v. R.R. Comm'n of Tex.*, 679 F.2d 51, 52-53 (5th Cir. 1982) (NGPSA); *Kinley Corp. v. Ia. Utils. Bd. Utils. Div., Dep't of Commerce*, 999 F.2d 354, 358-59 (8th Cir. 1993) (HLPSA).  But the cases do not discuss how to delimit the preempted domain of "safety."  In some instances, the state laws at issue more clearly pertain to safety than does § 10. *See*, *e.g.*, *N. Border Pipeline Co. v. Jackson County*, 512 F. Supp. 1261, 1262 (D. Minn. 1981) (requirement that pipeline be buried at least six feet underground); *Natural Gas Pipeline*, 679 F.2d at 52 (regulations designed to prevent accidental release of hydrogen sulfide); *ANR Pipeline Co. v. Iowa State Commerce Comm'n*, 828 F.2d 465, 471 (8th Cir. 1987) (evidence of admission by state commission

that permit was required "for safety reasons").  But in a suit involving facts more similar to the instant case, the court held that the defendant city's zoning ordinances and building codes were preempted as applied to the proposed modification of an interstate liquid natural gas facility.  *Algonquin LNG v. Loga*, 79 F.Supp.2d 49, 52 (D. R.I. 2000).  The court reasoned that because of the comprehensive federal regulation of interstate gas facilities under both the NGPSA and the Natural Gas Act ("NGA"), "there is no room for local zoning or building code regulations on the same subjects."  *Id*.

Today's case, however, is distinguishable from *Algonquin*.  The facility in *Algonquin* was an interstate facility regulated not only by DOT under the NGPSA but also by the Federal Energy Regulatory Commission ("FERC") under the NGA.  *See id.* at 50.  The *Algonquin* court relied in part on the comprehensiveness of the FERC regulations to decide that the city's zoning and building laws were preempted.  *Id*. at 51-52 (discussing 18 C.F.R. §§ 380.12, 380.15).  For example, the FERC regulations required the facility in *Algonquin* to submit several reports detailing the likely impact of its proposed modification on surrounding land use and to undertake construction so as to minimize the impact on scenic, historical, and other sensitive areas.  *Id*. (discussing 18 C.F.R. §§ 380.12, 380.15).  As is evident from *Algonquin*'s discussion, the FERC regulations under the NGA covered more than pipeline safety.  The

regulations directly addressed the aesthetic and noise effects of interstate gas facilities. In applications to FERC under the NGA for construction of gas pipeline facilities, applicants must discuss "changes to [existing] land uses that would occur if the project is approved." 18 C.F.R. § 380.12(j)(2008). They must also "[d]escribe measures proposed to mitigate the aesthetic impact of the facilities especially for aboveground facilities such as compressor or meter stations." *Id.* § 380.12(j)(11). And applicants must "identify the effects of the project on the existing air quality and noise environment." *Id.* § 380.12(k). "New compressor stations or modifications of existing stations shall not result in a perceptible increase in vibration at any noise-sensitive area." *Id.* § 380.12(k)(4)(v)(B). The comprehensive nature of the FERC regulations is consistent with the broad purposes of the NGA:

> The NGA long has been recognized as a comprehensive scheme of federal regulation of all wholesales of natural gas in interstate commerce. The NGA confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale. FERC exercises authority over the rates and facilities of natural gas companies used in this transportation and sale through a variety of powers.

*Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300-01 (1988) (internal quotation marks and citations omitted). By contrast, the PSA—targeting the safety risks to life and property posed by pipeline transportation and facilities—has a more limited purpose.

*See* 49 U.S.C. § 60102(a)(1). Thus it does not follow inexorably that a law preempted under the NGA would be preempted under the PSA.

Unlike the challenge involving the liquid natural gas facility in *Algonquin*, TMGS alleges preemption only under the PSA. It does not assert preemption under the NGA or posit that it is an interstate facility subject to FERC's regulation under the NGA. Therefore, the court declines to apply *Algonquin* and hold that § 10 is preempted simply as a local zoning ordinance.

D

Against a somewhat undeveloped decisional backdrop, the court must decide whether § 10 falls within the expressly preempted domain of "safety" under the PSA. TMGS maintains that it does. It argues that § 10 and the PSA regulations address the same subject matter: the design and construction of compressor stations. TMGS reasons that this direct overlap means that § 10 is preempted.[6]

_____

[6]TMGS offers two additional arguments. It maintains that the City is attempting to distinguish its regulation of compressor stations from regulation of underground pipelines. The court agrees with TMGS that the PSA preempts safety regulation of both compressor stations and pipelines. Because a compressor station is above ground, however, it is obviously more likely to implicate non-safety concerns, such as aesthetics. For this reason, the distinction is relevant.

TMGS also contends that § 10 is entirely preempted because it interferes with the federal objective of uniform regulation by imposing requirements on compressor stations in addition to those of the PSA, leading to a patchwork quilt of regulation. The court disagrees. The PSA's goal of uniformity applies only to *safety* regulation. Thus, as will be discussed later, the part of § 10 that pertains to safety is preempted, and the parts that do not are

- 22 -

The City responds that § 10 does not address compressor station safety. Rather, it relates to general aesthetics and community enhancement and was designed to protect property values by regulating the aesthetics, location, and noise level of compressor stations. The City contends that § 10 does not become a safety regulation simply because it in some way impacts the design or construction of compressor stations.

The mere existence of some overlap in subject matter between § 10 and the PSA regulations does not necessarily mean that § 10 is a "safety standard" preempted by the PSA. Although the PSA regulations address the design and construction of compressor stations, DOT's authority to regulate these matters is limited to addressing safety. *See* 49 U.S.C. § 60102(a)(1)("The purpose of [the PSA] is to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation."); *id*. § 60102(a)(2) ("The Secretary shall prescribe minimum *safety* standards for pipeline transportation and for pipeline facilities.") (emphasis added). Because a compressor station is above ground, unlike a pipeline, it is apparent that there are non-safety concerns related to its

---

not subject to the goal of uniformity. To the extent that TMGS is concerned about complying with a patchwork quilt of aesthetic and other *non-safety* regulations, Congress is the body to which it should address these concerns.

design and construction, including aesthetics.  This is supported

by the fact that the FERC regulations under the NGA address such

concerns.  *See supra* § IV(C).  DOT lacks authority under the PSA to

regulate the aesthetic aspects of design and construction.  Nor do

its regulations purport to do so.  *See* 49 C.F.R. pt. 192 (entitled

"Transportation of Natural and Other Gas by Pipeline: Minimum

Federal *Safety* Standards") (emphasis added).  In short, with

respect to compressor stations, the expressly preempted domain of

safety is not coextensive with the domain of design and

construction.

Nonetheless, "safety" should not be understood in so narrow a

sense that only a state law identical to the PSA or its regulations

would fall within it.[7]  For guidance, the court examines cases

---

[7]TMGS maintains that *ANR Pipeline* supports its argument that
§ 10 is preempted because it touches on the subject matter of
design or construction of compressor stations.  The Eighth Circuit
in *ANR Pipeline* held that an Iowa law was preempted under both the
NGPSA and the NGA.  The law was explicitly "designed 'to protect
the safety and welfare of the public'" and regulated, among other
things, the construction and burying of underground pipelines.  *ANR
Pipeline*, 828 F.2d at 466 (quoting Iowa Code Ann. § 479.1 (West.
Supp. 1987)).  Moreover, in the state commission's order imposing
fines against ANR, it stated that the permits were required "for
safety reasons."  *Id.* at 471 (internal quotation marks omitted).
Against this backdrop, the court distinguished cases cited in
support of the state law: "[T]he state legislation and permits at
issue here are designed to address the same subject matter and
activity as is regulated by the federal statute."  *Id.*  Because the
NGPSA delegated to DOT the sole authority "to regulate the *safety
of construction and operation* of interstate gas pipelines," the
Iowa law was preempted.  *Id.* at 472 (emphasis added).  Therefore,
*ANR Pipeline* does not support the proposition that a law is
preempted merely because it regulates the subject matter of
construction or design of a pipeline facility.  Rather, the

analyzing preemption under statutes that make a similar distinction between safety and non-safety matters.  The court concludes that it should evaluate § 10 in light of the purpose of the PSA, considering whether § 10 has either the purpose of regulating compressor station safety or a direct and substantial effect on it.

Cases decided under the National Manufactured Housing Construction and Safety Standards Act ("Manufactured Housing Act"), 42 U.S.C. §§ 5401-5426, address the distinction between safety and aesthetics by examining the purpose and effect of the allegedly preempted law.  Under the Manufactured Housing Act, the states are prohibited from adopting standards relating to the "construction and safety" of manufactured housing that are not identical to federal standards.  42 U.S.C. § 5403(d).  Courts have reasoned that this statute is consumer protection legislation, designed to mitigate the risks associated with manufactured housing.  As such, they conclude that states may enact laws designed to regulate the appearance or location of manufactured housing and that do not affect safety of consumers.  For example, in *Georgia Manufactured Housing* the court upheld a roof pitch requirement, reasoning that:

_____

question is whether it can be said to regulate the *safety* aspects of construction or design.

> [T]he construction and safety standards
> preempted by the Act are those standards that
> protect consumers from various potential
> hazards associated with manufactured housing.
> In contrast, a zoning requirement related to
> aesthetics is not preempted because the *goals*
> and *effects* of such a standard have nothing to
> do with consumer protection, but instead seek
> to control the aesthetic quality of a
> municipality's neighborhoods.

*Ga. Manufactured Housing*, 148 F.3d at 1310 (emphasis added).

The Atomic Energy Act ("AEA"), 42 U.S.C. § 2011-2296, also distinguishes between safety and non-safety matters. The AEA preempts regulation of radiological safety in nuclear power plants, but states are allowed to legislate regarding other concerns, such as the necessity, reliability, and cost of nuclear power. *Pac. Gas & Elec.*, 461 U.S. at 204. In two cases decided under the AEA, the Supreme Court examined both the purpose and effect of challenged state laws to determine whether they regulated radiological safety. In *Pacific Gas & Electric* the Court upheld a California statute that imposed a moratorium on construction of new nuclear power plants until the development of an acceptable method to dispose of nuclear waste. Because no long-term disposal method existed, the generation and storage of nuclear waste implicated both safety and economic concerns. *Id.* at 195-96. Although "[a] state moratorium on nuclear construction grounded in safety concerns" would be within the field preempted by the AEA, the Court reasoned that California's law was aimed at the economic aspect of the problem—that lack of storage space would lead to shutdowns in

nuclear reactors. *Id*. at 213-16. Therefore, it was not preempted. *See also English v. Gen. Elec. Co.*, 496 U.S. 72, 84 (1990) ("[T]he pre-empted field [is defined], in part, by reference to the motivation behind the state law.").

In *English* the Supreme Court made clear that even laws with a non-safety purpose could be preempted because of their effect on radiological safety. The Court considered whether an employee's state tort claim against her employer, which operated a nuclear fuels production facility, was preempted under the AEA. Although the state tort law at issue clearly was not motivated by radiological safety concerns, it would still be preempted if it had a "direct and substantial effect" on radiological safety. *English*, 496 U.S. at 84-85. The Court determined, however, that although such claims would increase the cost of retaliation by an employer, this did not amount to a direct and substantial effect on the employer's decisions concerning radiological safety.[8] *Id*. ("[F]or a state law to fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those who

_____

[8]The "direct and substantial effect" test has been employed to analyze preemption under other statutes as well. *See*, *e.g.*, *Phillip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 86 (1st Cir. 1997) (Federal Cigarette Labeling and Advertising Act and Comprehensive Smokeless Tobacco Health Education Act); *Bishop v. Fed. Intermediate Credit Bank of Wichita*, 908 F.2d 658, 660 (10th Cir. 1990) (Farm Credit Act); *Gay v. Carlson*, 1991 WL 190584, at *4 (S.D.N.Y. Sept. 17, 1991) (Federal Aviation Act); *cf. Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (adopting "directly, substantially and specifically regulates" standard under Occupational Safety and Health Act).

build or operate nuclear facilities concerning radiological safety levels."). As such, the state tort claim was not preempted. *Cf. Schneidewind*, 485 U.S. at 308 ("Of course, every state statute that has some indirect effect on rates and facilities of natural gas companies is not pre-empted.").

E

Examining both the purpose and effect of § 10, and applying the presumption against preemption of traditional state police powers, the court holds that TMGS has established a substantial likelihood of success as to part of its preemption claim. Initially, considering § 10 as a whole and the context in which it was enacted, its purpose does not appear to be the regulation of safety. At the July 1, 2008 City Council meeting during which § 10 was enacted, a council member stated: "[K]eeping with this theme of compatibility we are proposing that an SUP, a specific use permit, should be established for the regulation of natural gas compressor stations. That design standards be put in place to again make these stations compatible with the visual context of the surrounding development area[.]" D. App. 011 (transcript of July 1, 2008 City of Grand Prairie City Council meeting); *see also* D. App. 002 (affidavit of Chief City Planner) ("The purpose of Section 10 was to provide for [an SUP] process regarding natural gas compressor stations, to create design standards to make these stations compatible with the visual context of surrounding

community, and to protect property values."). There is no indication in the record that the City intends § 10 as a whole to be a safety regulation in the guise of a zoning ordinance. Further, the parties focus their arguments on § 10 in general, and TMGS offers no evidence regarding whether particular components of § 10 affect the safety of its proposed compressor station. Nevertheless, the court examines each of the components of § 10 to determine whether any component has a more specific purpose that relates to safety or has a direct and substantial effect on safety.

Section 10.2 provides for a minimum setback applicable to all yards. The applicable number of feet varies depending on the zoning district. There is no evidence to suggest that the setback provision is animated by a safety purpose. The question that remains, however, is whether, as in *English*, the minimum building setback will have a direct and substantial effect on TMGS' decisions regarding safety. In general, the relative proximity of buildings to buildings on adjacent property implicates safety——particularly, fire safety. This is corroborated by the fact that the PSA regulations, which concern safety, address proximity. *See* 49 C.F.R. 192.163(a) (requiring that each main compressor building be far enough away from buildings on adjacent property to minimize risk of fire's spreading and be surrounded by enough open space to allow free movement of fire-fighting equipment). Setback requirements, however, also have aesthetic

purposes and effects.  Where they are uniform throughout a neighborhood, they promote a pleasing appearance, and they may also function to keep certain structures farther away from public view. The validity of § 10.2 thus depends on whether the City can achieve its intended aesthetic purposes without having a direct and substantial effect on TMGS' decisions regarding the safety of the compressor station.  The court concludes that it can.  Because § 10.2 requires only a minimum setback, it does not constrain TMGS from deciding that it should implement a greater setback in order to minimize the risk of fire.

Presumably, TMGS would posit that if a narrower setback would provide an acceptable level of safety, a property owner should not be required to comply with § 10.2's greater setback requirement. The validity of this argument, however, pivots on the purpose of the PSA.  If its purpose is to regulate the *location* of compressor stations, the argument would have force.  But the PSA's purpose is to promote the *safety* of compressor stations.  In light of this purpose and the presumption of non-preemption, the court is unable to conclude that the PSA precludes the City from imposing a setback requirement on compressor stations for an aesthetic purpose, merely because this may have the incidental effect of increasing safety in cases where the minimum setback requirement is greater than that which is required for safety purposes.  This is not a direct and substantial effect on decisionmaking regarding safety.  Therefore,

TMGS is not likely to succeed on its preemption claim as to § 10.2's setback provision.

Section 10.3 requires an eight-foot high "security fence" around the compressor station site. Along boundary lines that front a public right-of-way, the fence must be made of wrought iron with brick or stone columns every fifty feet. This provision appears to have dual purposes. The term "security fence" suggests a safety purpose, while the requirements regarding materials and columns suggest an aesthetic purpose. Considering the effect of this provision, the primary function of a fence (particularly a tall fence of eight feet) is to contain safety hazards within the compressor station site and to prevent persons outside from incurring a risk or causing one. In light of this direct and substantial effect on safety and the fact that safety is one stated purpose for requiring the fence, § 10.3 is preempted to the extent that it requires TMGS to erect a fence around its compressor station site.

By contrast, the requirement that, where the fence fronts a public right-of-way, it be made of wrought iron with brick or stone columns every 50 feet, neither has a safety purpose nor a direct and substantial effect on safety. Therefore, the requirement that any fence that TMGS chooses to erect along a public right-of-way be made of wrought iron with brick or stone columns every 50 feet is

not preempted.[9]

Section 10.4 imposes several requirements regarding the compressor station building: masonry bulkhead walls, brick and stone accents, roof pitch, a raised structure on the roof, specified non-masonry building materials, and a prescribed architectural design. This provision does not appear to have a safety purpose. Rather, the nature of these requirements and the terms used suggest that their purpose is aesthetic. The masonry bulkhead walls and the brick and stone accents are to be constructed on the two building facades "most visible to the public." § 10.4(A), (B). The architectural design is to be "compatible with the visual context of the surrounding development." § 10.4(E).

The next question is whether these requirements will have a direct and substantial effect on TMGS' decisions concerning safety. The PSA regulations address the materials used to construct compressor stations, requiring merely that they be noncombustible if the building is to contain a certain type of equipment or pipe. 49 C.F.R. § 192.163(b). While the PSA addresses what materials are safe to use, nothing in the statute or regulations precludes the

---

[9]Common sense suggests that TMGS will opt to erect a fence, if for no other reasons than to protect its property from loss or damage, prevent or reduce personal injuries, and mitigate the potential for premises liability claims. So although the City cannot compel TMGS to erect a security fence, if TMGS chooses to construct one, it must comply with the other requirements of § 10.3.

City from imposing, within this broad scope, more particular requirements as to building materials and design. It is not the intent of the PSA to confer on TMGS the unfettered discretion to design and construct the compressor station buildings regardless of their aesthetic qualities. Rather, the statutory and regulatory scheme governing natural gas pipeline implies otherwise. The fact that FERC considers the aesthetic impact of compressor stations subject to its jurisdiction suggests that municipalities should be permitted to do the same with compressor stations not regulated by FERC. Otherwise, with respect to these pipelines, aesthetics would fall into a regulatory vacuum that is left largely, if not entirely, within the discretion of natural gas companies.

In short, under the PSA, DOT is empowered to dictate that compressor stations be designed, constructed, and operated safely. Subject to that authority, the City is authorized to protect its citizens and property owners from the effects of unsightly edifices. Therefore, TMGS is not likely to succeed on its preemption claim as to § 10.4's requirements regarding the compressor station building.

Sections 10.4(F), 10.5, and 10.6 require a concrete driveway and parking areas, regulate the level of noise emitted by the compressor station, and require landscaping compatible with the surrounding area, respectively. It is neither the purpose nor effect of these provisions to regulate compressor station safety.

Moreover, as explained above, if the City cannot regulate in these respects, there will be a regulatory vacuum in matters that are of legitimate concern to the denizens of Grand Prairie.

Finally, TMGS is not likely to succeed on its preemption claim as to § 10.1's requirement of a building permit and an approved, platted lot. TMGS has failed to adduce evidence that allows the court to infer that these requirements have either the purpose or effect of regulating compressor station safety.

F

Because TMGS is likely to succeed on its preemption claim as to only part of § 10, the court must consider the severability of § 10's provisions. TMGS argues that § 10's provisions are not severable, citing a case involving an Iowa law. *See Kinley*, 999 F.2d at 359-60 (holding non-safety provisions preempted because they were not severable from safety-related provisions of law regulating pipeline transportation). Because severability is a question of state law, however, the court must examine Texas law. *See Tex. Pharmacy Ass'n v. Prudential Ins. Co. of Am.*, 105 F.3d 1035, 1039 (5th Cir. 1997).

> The rule is that part of an ordinance, like part of a statute, may be void without affecting the validity of other parts, if they are not dependent on each other; that is, if the valid portions are capable of being executed without the invalid part, in accordance with the will of the legislative body.

*Sam v. Sullivan*, 189 S.W.2d 69, 74 (Tex. App. 1945, writ ref'd.

w.o.m.); *accord City of Fort Worth v. Atlas Enters*., 311 S.W.2d
922, 924 (Tex. App. 1958, writ ref'd n.r.e.); *cf. Rose v. Doctors
Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990) (noting that in interpreting
state statute, key inquiry is whether valid and invalid provisions
are "so connected in meaning that it cannot be presumed the
legislature would have passed the one without the other"). 
Although § 10 itself does not contain a severability provision, the
City's Unified Development Code does.

> All sections, paragraphs, sentences, clauses,
> and phrases of this ordinance are severable,
> and if any such section, paragraph, sentence,
> clause, or phrase is declared unconstitutional
> or otherwise invalid in any court of competent
> jurisdiction in a valid judgment or decree,
> such unconstitutionality or invalidity shall
> not cause any remaining section, paragraph,
> sentence, clause or phrase of this ordinance
> to fail or become inoperative.

Grand Prairie, Tex., Unified Dev. Code art. 1, § 9 (2008).

After striking the provision of § 10 that the court has found
to be preempted, it is still possible to give legal effect to the
others without vitiating the purpose of § 10. The severability
provision of the Unified Development Code indicates that the intent
of the City's legislative body is to enforce the valid provisions
of an ordinance even if others are held invalid.[10] Therefore, the

_____

[10]At oral argument, TMGS contended that the court should not
sever any invalid provisions of § 10 because the City had not made
this request, citing *Ayotte v. Planned Parenthood of Northern New
England*, 546 U.S. 320 (2006). *Ayotte*, however, does not stand for
the proposition that a party must specifically move for severance.
Rather, it emphasizes that "the touchstone for any decision about

court holds that the preempted provisions of § 10 likely are severable.

V

The court next considers whether TMGS has established a likelihood of success on the merits of its eminent domain claim as to the non-preempted provisions of § 10.

A

Texas law grants TMGS, as a "gas corporation," the power of eminent domain. Tex. Utils. Code Ann. § 181.004 (Vernon 2008). TMGS maintains that this power permits it to build the compressor station without adhering to local zoning regulations. The City asserts that TMGS' eminent domain power is irrelevant because it already owns the land on which it plans to build the compressor station and does not seek to condemn any other property. Alternatively, the City maintains that § 10 does not usurp TMGS' eminent domain power.

B

The court disagrees with the City that, merely because TMGS is not attempting to condemn property, its eminent domain power is not implicated. Under Texas law, an entity with eminent domain power has the right not only to appropriate another's property but also to use its own property for a public purpose, even if it did not

---

remedy is legislative intent." *Id*. at 321. Here, the severability clause in the City's Unified Development Code manifests legislative intent in favor of severance.

acquire the property through condemnation. *See Gulf, Colo. & Santa Fe Ry. Co. v. White,* 281 S.W.2d 441, 449 (Tex. App. 1955, writ ref'd n.r.e.) ("Where a company [with eminent domain power] secures property to be devoted to a public use, it is immaterial that title was acquired by a valid purchase or settlement; the rights acquired are protected to the same extent as though the property had been condemned."). Thus the controlling question is whether TMGS' eminent domain power gives it the right to build the compressor station without adhering to § 10.

In *Porter v. Southwestern Public Service Co.*, 489 S.W.2d 361 (Tex. App. 1972, writ ref'd n.r.e.), on which the City relies, the Texas Court of Appeals held that as an "abstract principle," a public utility's power of eminent domain is not "superior to the zoning ordinance of a home-rule city." *Id.* at 362. *Porter* involved an electric utility that built an electrical substation. Nearby landowners sued for an injunction ordering the utility to move the substation, alleging that it was improperly located in an area zoned residential without a special use permit. The court rejected the utility's argument that its eminent domain power relieved it from complying with the zoning ordinance, noting that it had purchased the land with notice of its zoned status and that no evidence suggested that the city had abused its discretion in denying the special use permit. *Id.* at 364. Reasoning that the city's police powers permitted it to exclude business buildings

from residential areas, the court concluded: "[T]he city, in discharging the delegated police powers, does not usurp the eminent domain authority of [the utility] by requiring it to meet certain standards any more than it usurps the control and management of individuals over their property and affairs by making them meet the same standards." *Id*. at 364-65. Moreover, "if the city cannot require certain standards, there could be only [the utility] itself to determine such standards," which would create a regulatory vacuum detrimental to the public health, safety, and welfare. *Id*. at 365.

In reaching this conclusion, the *Porter* court distinguished two earlier courts of appeals cases that held in favor of the entity with eminent domain power. In *Fort Worth & Denver City Railway Co. v. Ammons*, 215 S.W.2d 407 (Tex. App. 1948, writ ref'd n.r.e.), the court held that a railroad's eminent domain power gave it the right to construct tracks on land it owned in an area zoned residential. The court reasoned that the city's zoning ordinance was in conflict with the railroad's state-granted eminent domain power to the extent that it prohibited construction of the tracks on land selected by the railroad for that purpose. *Id*. at 411. Moreover, the railroad had owned the land for many years before the zoning ordinance was enacted, and it would be "disastrous" for the public if the tracks were not constructed. *Id*. at 410. Regarding the city's building code, the court held that, despite the

railroad's eminent domain power, it was obligated to apply for the required permit. *Id*. at 411. Considering similar facts, the *Gulf, Colorado* court followed *Fort Worth & D.C. Ry.* and held that a railroad's power of eminent domain allowed it to extend its tracks into a district zoned residential. *Gulf, Colo.*, 281 S.W.2d at 449-450. The *Porter* court distinguished both *Fort Worth & Denver City Railway* and *Gulf, Colorado* by reasoning that they did not hold that the eminent domain power always supersedes local zoning regulations and that they involved instances where the entity seeking to exercise the right of eminent domain had owned the land long before enactment of the challenged ordinances and where no other land was practicable for the intended public use. *Porter*, 489 S.W.2d at 364.

TMGS maintains that *Porter*'s holding is an aberration and that two later Texas Supreme Court cases implicitly repudiate *Porter* and hold that an entity with eminent domain power is not subject to zoning regulations if it acts reasonably. In *Austin Independent School District v. City of Sunset Valley*, 502 S.W.2d 670 (Tex. 1973), a city that was zoned entirely residential refused to amend its zoning ordinance to allow construction of school athletic facilities. The court held that a city may not employ its zoning power so as to "wholly exclude from within its boundaries school facilities reasonably located." *Id.* at 672. The court emphasized the narrowness of its holding, explicitly distinguishing cases

involving zoning ordinances that regulated construction of school facilities, in the interests of health and safety, rather than site selection. *Id.* at 674. The court noted that "[t]he policy considerations justifying regulations of school construction have no application to the selection of school sites." *Id.* (internal quotation marks omitted).

In *City of Lubbock v. Austin*, 628 S.W.2d 49 (Tex. 1982), the court held that a city is not bound by its own zoning ordinances when it reasonably exercises the power of eminent domain. The court permitted the city to condemn part of the plaintiffs' land to widen a heavily traveled intersection, even though this would leave their yard size in violation of the zoning ordinance. *Id.* at 49-50.

The court concludes that *Porter* is in tension with the later Texas Supreme Court decisions in *Austin Independent School District* and *City of Lubbock*. Although *Porter* subjected a utility with eminent domain power to a zoning ordinance that prohibited its intended public use in the desired location, *Austin Independent School District* and *City of Lubbock* allowed the eminent domain entity to operate in the desired location despite contrary zoning ordinances. Nonetheless, *Austin Independent School District* and *City of Lubbock* do not teach that the eminent domain power confers the right to disregard all kinds of zoning regulations so long as the entity acts reasonably. Rather, an important distinction

emerges.  While entities with eminent domain power have the right to select the location for their intended public use⸺even if such use is not permitted in the zoning district⸺they may still be subjected to other applicable zoning regulations.  *Austin Independent School District* explicitly distinguished between regulation of site selection and construction, limiting its holding to the former.  Similarly, in *Fort Worth & Denver City Railway*, although the railroad was allowed to construct tracks despite a prohibitive zoning ordinance, it was still required to comply with the relevant building regulations.  Finally, *Gulf, Colorado* and *City of Lubbock*, both of which held in favor of eminent domain entities, involved zoning ordinances that interfered with the entities' selection of location.  In short, zoning regulations that do not prohibit⸺i.e., "zone out"⸺the intended public use are not necessarily superseded by the eminent domain power.

C

Section 10 does not prohibit TMGS from constructing a compressor station on the land it selected for that purpose.  It does not "zone out" compressor stations from the district in which TMGS' land is located.  Rather, in its non-preempted provisions, it regulates the aesthetics and noise level of compressor stations.  In this respect, it is analogous to the building regulations in *Fort Worth & Denver City Railway* or to regulation of school construction in *Austin Independent School District*, which were not

held to usurp the eminent domain power.  Thus TMGS has failed to show that its eminent domain power gives it the right to build the compressor station without adhering to § 10.  Further, as the *Porter* court reasoned, if the City cannot regulate the aesthetics and noise level of compressor stations within its boundaries, these will be entirely within TMGS' discretion, which may be detrimental to the surrounding community.  Therefore, the court holds that TMGS is not likely to succeed on the merits of its eminent domain claim.

VI

The court now turns to TMGS' dormant Commerce Clause claim.

A

The Constitution grants Congress the authority to "regulate commerce . . . among the several States[.]"  U.S. Const. art. I, § 8, cl. 3.  Implied in this affirmative grant of power is a "'negative' or 'dormant' constraint on state regulatory authority." *Siesta Vill. Mkt., LLC v. Perry*, 530 F.Supp.2d 848, 862 (N.D. Tex. 2008) (Fitzwater, C.J.), *appeals docketed*, Nos. 08-10145 (5th Cir. Feb. 18, 2008), 08-10146 (5th Cir. Feb. 19, 2008), 08-10148 (5th Cir. Feb. 19, 2008 ), and 08-10160 (5th Cir. Feb. 21, 2008).  The so-called dormant Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 497 (5th Cir. 2004) (internal quotation marks

omitted).

"A statute implicates the dormant Commerce Clause if it discriminates against interstate commerce 'either facially, by purpose, or by effect.'" *Siesta Vill.*, 530 F.Supp.2d at 862 (quoting *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007)). Under this two-tiered approach, statutes that facially discriminate against out-of-state entities are "virtually *per se* invalid." *Nat'l Solid Waste*, 389 F.3d at 497. Statutes that "regulate evenhandedly," however, and burden interstate commerce only indirectly are subject to the balancing test of *Pike v. Bruce Church*, *Inc.*, 397 U.S. 137 (1970). *Nat'l Solid Waste*, 389 F.3d at 497. Under *Pike* a statute will be upheld if it serves a legitimate local interest and the burden on interstate commerce is not "'clearly excessive' in relation to the putative local benefits." *Allstate*, 495 F.3d at 160 (quoting *Pike*, 397 U.S. at 142).

B

Because § 10 does not discriminate on its face between in-state and out-of-state companies seeking to build a compressor station in Grand Prairie, the court applies the *Pike* balancing test.

1

The court first considers whether § 10 incidentally burdens interstate commerce. "The incidental burdens to which *Pike* refers are the burdens on interstate commerce that exceed the burdens on

intrastate commerce." *Nat'l Solid Waste*, 389 F.3d at 502 (internal quotation marks omitted).  In other words, the challenged law must have a "disparate impact on interstate commerce." *Id.* (internal quotation marks omitted).  Additionally, a statute burdens interstate commerce "when it inhibits the flow of goods interstate." *Allstate*, 495 F.3d at 163; *accord Nat'l Solid Waste*, 389 F.3d at 502.

TMGS maintains that § 10 burdens interstate commerce because it will raise the cost of constructing the compressor station and may delay, or even prevent, its completion.  According to the declaration of one TMGS manager, this will cause TMGS to default on its commitments to deliver natural gas to the transport company that ships it to consumers both inside and outside Texas.  The City responds that these claims are purely speculative and that TMGS has not met its burden of proving likelihood of success under the dormant Commerce Clause.

TMGS has failed to establish that § 10 has a disparate impact on interstate commerce.  Even if complying with § 10 would undoubtedly result in increased costs and delay, TMGS has failed to show that compliance will affect interstate commerce.  Assuming that delay causes TMGS to be late in delivering gas to the transport company, thereby causing delayed gas deliveries to ultimate consumers, this still will not have a disparate impact on interstate commerce relative to intrastate commerce.  Natural gas

shipped to consumers both inside and outside Texas will be equally delayed. And even if a greater quantity of gas gathered by TMGS ultimately is sold out-of-state versus in-state, this is the result of the fortuity that the seller of TMGS-gathered gas has more customers outside Texas than inside.

Nor has TMGS shown that § 10 inhibits the interstate flow of natural gas. Section 10 does not prohibit TMGS or any other natural gas company from gathering gas in, or transporting gas through, Grand Prairie and selling it for ultimate distribution out-of-state. Although the requirements of § 10 may cause TMGS to incur additional costs or delay that make them less competitive, this alone does not amount to a burden on interstate commerce. *See*, *e.g.*, *Nat'l Solid Waste*, 389 F.3d at 502 ("[W]hile the ordinances may have the effect of shifting some business away from plaintiffs, as the ordinances increase their costs and make them relatively less competitive, this result does not mean that the ordinances burden interstate commerce[.]"); *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 727 (5th Cir. 2004) ("The fact that a regulation causes some business to shift from one supplier to another does not mean that the regulation burdens commerce; the dormant Commerce Clause 'protects the interstate market, not particular interstate firms.'" (quoting *Exxon Corp v. Governor of Md.*, 437 U.S. 117, 127-28 (1978))). If TMGS' position were adopted, no state or local government could impose

nondiscriminatory regulations on a company whose goods ultimately traversed state lines if doing so made the entity less competitive by increasing its costs or causing delay in getting its goods to the interstate market.

Additionally, TMGS asserts that the court should consider the effect on interstate commerce if many cities enact ordinances like § 10. TMGS asserts that such a "patchwork quilt of regulation" would significantly disrupt interstate commerce. In this respect, TMGS argues that § 10 is like the Iowa law regulating the length of trucks, which the Supreme Court invalidated under the dormant Commerce Clause. *See Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662 (1981).

The Iowa law in *Kassel* restricted the length of tractor-trailers on Iowa highways, prohibiting the use of 65-foot "doubles." *Id*. at 665. Every other state in the West and Midwest permitted such vehicles. *Id*. This required trucking companies to decide whether to use a different type of tractor-trailers on interstate voyages passing through Iowa, detach the trailers of a "double" and drive them separately through Iowa, or avoid Iowa altogether. *Id*. at 667. The Supreme Court held that this substantial burden on interstate commerce was not justified by the law's "illusory" safety rationale. *Id*. at 671.

The facts of *Kassel* bear little similarity to the present case. Because a single compressor station does not move from state

to state, it will not need to be repeatedly reconfigured to comply with differing ordinances regulating aesthetics and noise level. Nor has TMGS shown that there is a single, comprehensive template currently used for compressor stations that must be altered to comply with ordinances like § 10 in each state. Where possible, natural gas companies will likely incorporate local ordinances regulating aesthetics and noise levels into their building plans. Thus a "patchwork" of such regulations will not cause a disruption of interstate commerce as in *Kassel*. *See Exxon*, 437 U.S. at 128 (reasoning that a "lack of national uniformity" is problematic under the dormant Commerce Clause only where it "would impede the flow of interstate goods"); *cf. Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052, 1059 (9th Cir. 1987) (upholding city's franchise fee against oil company) ("Interstate transportation of oil is not impeded by the fact that states, counties, cities, and private landowners may assess *different* charges for the use of land under or through which a pipeline passes.").

2

Even assuming that § 10 imposes some burden on interstate commerce, TMGS has failed to show that it would be clearly excessive in light of § 10's legitimate local benefits. "[T]he extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate

activities." *Nat'l Solid Waste*, 389 F.3d at 501 (quoting *Pike*, 397 U.S. at 141). Further,

> [i]n assessing a statute's putative local benefits, we cannot second-guess the empirical judgments of lawmakers concerning the utility of legislation. Rather we credit a putative local benefit so long as an examination of the evidence before or available to the lawmaker indicates that the regulation is not wholly irrational in light of its purposes.

*Allstate*, 495 F.3d at 164 (internal quotation marks and footnotes omitted).

The City's interest in the aesthetic integrity and property values of its community is clearly a legitimate local interest. *See*, *e.g.*, *Tex. Manufactured Housing Ass'n, Inc. v. City of Nederland*, 101 F.3d 1095, 1104 n.10 (5th Cir. 1996) ("Maintenance of property values has long been recognized as a legitimate objective of local land use regulation[.]"). It is not wholly irrational for the City to conclude that, absent regulation, the compressor station might be either unsightly or noisy, thereby depressing surrounding property values. Therefore, considering the City's legitimate and substantial interest and the speculative nature of any burden on interstate commerce, the court holds that TMGS has failed to make the required showing that § 10 violates the dormant Commerce Clause.

Having addressed the likelihood of success on the merits of each of TMGS' claims, the court next considers the remaining requirements for obtaining preliminary injunctive relief. Because TMGS has demonstrated a substantial likelihood of success on the merits of part of its express preemption claim, this suggests that the balance of hardship and public interest factors weigh in favor of granting the preliminary injunction. *See supra* § III. And with respect to its other claims, on which it has not shown a substantial likelihood of success on the merits, the court need not consider the other requirements.

VIII

The City argues that granting a preliminary injunction would disrupt the status quo, allowing TMGS to build the compressor station in violation of § 10. The City contends this would render a decision on the merits meaningless.

The purpose of a preliminary injunction "is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). As discussed above, however, TMGS' likelihood of success on the merits of its preemption claim as to certain provisions of § 10 implies that it will suffer irreparable injury absent an injunction. Moreover, as TMGS suggests, there is no "magic in the phrase 'status quo.'" *Id*.

Rather, it begs the question of what is the status quo. The Fifth Circuit has described the relevant status quo as the "last uncontested status which preceded the pending controversy." *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1194 (5th Cir. 1975) (internal quotation marks omitted); *accord Canal Auth.*, 489 F.2d at 576. Here, the last uncontested status between TMGS and the City was prior to the consideration and enactment of § 10. Their dispute arose when TMGS began objecting to the proposed § 10 at public hearings. Therefore, granting a preliminary injunction against the enforcement of the preempted provisions of § 10 does not impermissibly alter the status quo.

IX

Finally, the court must decide whether to require TMGS to post security to compensate the City for any damages it may suffer if the preliminary injunction is dissolved upon eventual consideration of the merits. TMGS maintains that security, or only nominal security, is required because the City will not suffer any damages from the preliminary injunction. The City counters that TMGS should post security to compensate it for the civil fines that could be collected for violations of § 10, up to $2,000 per day, totaling at least $1.2 million.

Under Fed. R. Civ. P. 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and

damages sustained by any party found to have been wrongfully enjoined . . . ." The decision concerning the amount of the security is within the court's discretion, and it may decide not to require security. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). The security requirement is crucial, however, because it ensures that the enjoined party may readily collect damages if the injunction is later dissolved "without further litigation and without regard to the possible insolvency of the applicant." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 379 (5th Cir. 2008) (internal quotation marks omitted).

The preliminary injunction that the court is entering today is narrow in scope. The City will be precluded from enforcing a provision of the Unified Development Code that requires that the compressor station site be enclosed by a security fence, but the City will otherwise be able to enforce the Code against TMGS. In these circumstances, the court holds that security in the sum of $50,000 will adequately protect the City. Accordingly, TMGS must post security in that amount, either in cash or in the form of a bond approved by the Clerk of Court.

*       *       *

For the reasons explained, the court grants in part and denies in part TMGS' preliminary injunction application. A preliminary injunction will be entered separately.

November 25, 2008.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE